# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**
**ex rel DARREN MCAULEY,**

      **Plaintiff,**

**V**

**Case No.** 8:23-cv-716-MSS-CPT
**FILED IN CAMERA**
**UNDER SEAL**

**SIMONMED IMAGING, LLC;**
**SMI IMAGING, LLC;**
**SIMONMED IMAGING INCORPORATED;**
**SIMONMED IMAGING MSO, LLC;**
**HOWARD SIMON MD PC;**
**SIMONMED IMAGING FLORIDA LLC;**
**SIMONMED IMAGING NEBRASKA LLC; AND**
**AMERICAN SECURITIES LLC**

      **Defendants.**
_____/

## COMPLAINT AND JURY TRIAL DEMAND

Relator DARREN MCAULEY ("Relator") hereby files this qui tam action pursuant to the False Claims Act, 31 U.S.C. §3729, et seq., ("FCA") in the name of and on behalf of the United States of America ("United States") ("Plaintiff"), by and through his counsel of record, and states as follows:

### INTRODUCTION

1.      This is an action by Relator to recover penalties and damages arising from violations of the FCA committed by Defendants SimonMed Imaging LLC, SMI Imaging LLC, SimonMed Imaging Incorporated, SimonMed ImagingMSO, LLC, Howard Simon MD PC, SimonMed Imaging Florida LLC,

1

AM.
TPA # 68308

SimonMed Imaging Nebraska LLC and American Securities, LLC (collectively "Defendants").

2.      Defendants knowingly performed and caused to be performed radiology procedures on Medicare patients without the level of physician supervision specifically required by federal regulations.   Defendants knowingly presented false and fraudulent claims to the Government in order to be reimbursed for these unlawful procedures in violation of the FCA, and if the Government had known the true nature of Defendants' claims, it would not have reimbursed Defendants for these procedures.

## PARTIES

3.      Relator is a resident of Pinellas County, Florida.

4.      Relator was employed by Defendants as a Contrast Physician from July 2022 until his termination in December 2022 at Defendant's facility known as Carrollwood/Bayview located at 10010 N Dale Mabry Hwy # 150, Tampa, FL 33618.

5.      Defendant has personal knowledge of diagnostic tests Defendants performed or caused to be performed on Medicare patients without the required level of physician supervision.  Such tests resulted in knowingly false and fraudulent claims for healthcare services presented, or caused to be presented, by Defendants on Medicare and other patients, and therefore constitutes an original source as defined in 31 U.S.C. §3730(e)(4)(B), of the claims described herein.

2

6.      SimonMed Imaging LLC (hereinafter "SimonMed Imaging") is a foreign limited liability corporation formed pursuant to the laws of Arizona. Its principal business office is located at 16220 N. Scottsdale Rd., Suite 600, Scottsdale, AZ 85254. Upon information and belief, SimonMed owns, controls, and/or operates multiple radiology centers throughout the United States, and reports that it has over 160 locations across 11 states.

7.      Upon information and belief, SMI Imaging LLC is a foreign limited liability corporation formed under the laws of Arizona, which operates as an alter ego of SimonMed Imaging.

8.      Upon information and belief, SimonMed Imaging Incorporated is a foreign limited liability corporation formed under the laws of Arizona, which operates as an alter ego of SimonMed Imaging.

9.      Upon information and belief, SimonMed ImagingMSO, LLC, is a foreign limited liability corporation formed under the laws of Arizona, which operates as an alter ego of SimonMed Imaging.

10.     Upon information and belief, Howard Simon MD PC is a foreign professional corporation formed under the laws of Illinois, which operates as an alter ego of SimonMed Imaging.

11.     Upon information and belief, SimonMed Imaging Florida LLC, is a limited liability corporation formed under the laws of Florida, which operates as an alter ego of SimonMed Imaging.

12.     Upon information and belief, SimonMed Imaging Nebraska LLC, is a foreign limited liability corporation formed under the laws of Nebraska, which operates as an alter ego of SimonMed Imaging.

13.     Upon information and belief, American Securities, LLC is a private equity firm that owns SimonMed Imaging and directs the operations with the goal of maximizing profits at the expense of the health and safety of patients.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction), as well as 28 U.S.C. §1345 (as the United States is a Plaintiff) and 31 U.S.C. §§3730(b) and 3732(a) (the FCA).

15.     The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a), which authorizes nationwide service of process in cases brought under the FCA in a judicial district in which any one defendant can be found, resides, transacts business, or in which any act proscribed by the FCA occurred.  Defendants purposefully conduct (or conducted during all respective material times) business in this judicial district and, as alleged herein, various acts proscribed by the FCA occurred in this judicial district; thus, personal jurisdiction over all Defendants lies with this Court.

16.     Venue is appropriate within the Middle District of Florida pursuant to 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a) because a substantial part of the events and illegal acts and practices giving rise to the claims alleged in this Complaint occurred in this judicial district, because Defendants purposefully conduct (or conducted during all respective material

4

times) business in this judicial district, and because, as alleged herein, various acts proscribed by the FCA occurred in this judicial district.

17.    Relator has made the appropriate and confidential voluntary disclosures to the United States Government as required by 31 U.S.C. §3730(b)(2), the allegations of which are incorporated herein.

## SUMMARY OF APPLICABLE LAW

### A.    The False Claims Act

18.    Congress enacted the False Claims Act (the "FCA") which provides, in pertinent part, that any person who:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C)  conspires to commit a violation of subparagraph (A), (B), ... or (G); [or]
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$13,508 to $27,018 adjusted for inflation], plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. §3729(a)(1).

19.    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information "(i) has actual knowledge of

the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," and no proof of specific intent to defraud is required. 31 U.S.C. §3729(b)(1).

20.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).

**B.     The Medicare Program**

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, commonly known as the Medicare Program, to pay for the costs of certain healthcare services. The Medicare Program is a federal health insurance program for older Americans and persons with disabilities. Individuals who are insured by Medicare are known as beneficiaries. Medicare is funded by the federal government and administered by the Centers for Medicare & Medicaid Services ("CMS").

22.     The Medicare program is comprised of several parts.  Healthcare services and payment under Part B of the Medicare Program are the subjects of this case. Part B of Medicare is a federally subsidized, voluntary insurance program that covers a percentage (typically 80%) of the fee schedule amount for various medical and other health services provided to Medicare patients by physicians, laboratories, and other facilities. 42 U.S.C. §§1395k, 1395l, 1395x(s); see also 42 C.F.R. §410.152(b).

6

23.     Medicare reimburses health care providers for the reasonable costs of covered health services for Medicare beneficiaries. Healthcare providers rendering services to Medicare beneficiaries seek reimbursement by submitting a claim form to their assigned Medicare Administrative Contractor ("MAC"). MACs are assigned by providers' state.

24.     For reimbursement from Medicare, providers submit a claims form called a CMS Form 1500, a "Request for Medicare Payment" which identifies, among other things, the services provided to the patient, the symptoms or diseases suffered by the patient, and the medical professional providing the services. The provider further certifies, expressly and impliedly when submitting the CMS 1500 requesting payment, that the information provided is truthful. At all times relevant to this action, MACs reviewed and approved the claims at issue in this case based upon the claim information provided by Defendants, and relied on the veracity of the information in determining whether to pay the claims submitted by Defendants.

25.     When submitting claims to government health care programs, healthcare organizations and professionals are identified by a provider number. No healthcare provider may submit claims and receive payment from the Government for services provided to Medicare beneficiaries unless the provider has first applied for and received a Medicare provider number.

26.     Once approved, the provider number designated by Medicare is unique to that Medicare provider. All claims submitted by the Medicare

provider must utilize the specific provider number, and all Medicare payments for reimbursement must be identified by the specific provider number.

27. The American Medical Association developed and periodically updates a set of Current Procedural Terminology ("CPT") codes, which are used by physicians and other providers to identify and report the medical procedures they perform. The purpose of CPT codes is to provide a uniform language that accurately describes medical, surgical, and diagnostic services for reliable, standardized communication between physicians, government programs, and private health insurance plans throughout the United States.

28. When billing for services provided to Medicare patients, providers use Healthcare Common Procedure Coding System codes ("HCPCS codes"), which are based on the AMA's current CPT codes. Each common medical procedure or service, including diagnostic tests, is identified by a five (5) digit HCPCS code, which uniquely describes that particular service, procedure, or test. Providers use HCPCS codes to report which service they actually performed when seeking reimbursement from Medicare.

29. Medicare will pay for diagnostic tests only if they are provided by certain healthcare providers, including but not limited to physicians, group practices of physicians, and independent diagnostic testing facilities. 42 C.F.R. §410.33(a)(1). Thus, when a doctor orders that a patient receive a diagnostic radiology test, such as a CT or MRI, the patient can obtain that service from a group practice of physicians that has the necessary equipment.

30.    Medicare rules also require that all diagnostic tests or procedures payable under the Physician Fee Schedule be furnished under a specified level of supervision by a physician. 42 C.F.R. §410.33(b). Some procedures may be performed under the general supervision of a physician, while other tests require direct or personal supervision. 42 C.F.R. §410.33(b)(3).

31.    A "physician" includes "a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function or action." 42 U.S.C. §1395x(r)(1).

32. 42 C.F.R. § 410.32(b)(3)(i) provides:

*General supervision* means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the <u>physician</u>.

33. 42 C.F.R. §410.32(b)(3)(ii) provides:

*Direct supervision* in the office setting means the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed. Until the later of the end of the calendar year in which the PHE as defined in § 400.200 of this chapter ends or, December 31, 2021, the presence of the physician (or other practitioner) includes virtual presence through audio/video real-time communications technology (excluding audio-only).

34.    Thus, for procedures that require "direct supervision," the physician must be present in the office suite and immediately available to furnish assistance and direction during the performance of the procedure;

however, the physician is not required to be present in the actual room where the procedure is being performed. 42 C.F.R. §410.32 (b)(3)(ii).

35.    In 2021, CMS amended its diagnostic test supervision rules to permit, during the Covid-19 public health emergency, nurse practitioners (NPs), clinical nurse specialists (CNSs), physician assistants (PAs), and certified nurse-midwives (CNMs) – collectively referred to by CMS as non-physician practitioners (NPPs) – to provide direct supervision for Level 2 tests (e.g., MRIs or CTs with contrast) that require the proximity of being in the office suite and immediately available, but not in the room where the test is administered so long as the tests were performed in physician offices, hospital outpatient departments, and provider-based facilities. *Id.*

36.    CMS also amended its direct supervision rules to state the presence of the physician (or other practitioner) supervising Level 2 tests includes virtual presence through audio/video real-time communications technology (excluding audio-only). This virtual supervision rule is set to expire on the last day of the year when the public health emergency ends. *Id.*

37.    In the independent diagnostic testing facility setting, like those operated by Defendants, NPPs are not permitted to supervise diagnostic tests. *Id.*

38.    Tests performed in an independent diagnostic testing facility setting must be supervised only by physicians designated on the 855B Medicare enrollment application, Attachment 2, that attest via their written signature that they are "proficient in the performance and interpretation" of the tests they are

supervising. https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855b.pdf

39.    If a diagnostic procedure is not performed under the required level of physician supervision, it is not reasonable and necessary and is therefore not eligible for reimbursement by Medicare. *See* 42 C.F.R. §410.32(b)(1) ("Services furnished without the required level of supervision are not reasonable and necessary."); 42 U.S.C. §1395y ("[N]o payment may be made under [Medicare Part A or B] for any expenses incurred for items or services which ... are not reasonable and necessary.").

40.    Medicare requires specific levels of physician supervision for certain procedures in order to protect patients.  It does not cover and does not allow reimbursement for procedures without such supervision, which is material and essential to coverage and payment.

41.    CMS establishes the level of physician supervision required for each individual procedure and publishes this information on the Physician Fee Schedule, which is publicly available on the CMS website, and which designates the required level of supervision for each individual procedure based on the procedure's HCPCS code.

42.    Physicians sometimes prescribe their patients diagnostic radiology tests, such as Computed Tomography scans (also known as "CT" or "CAT scans") or Magnetic Resonance Imaging scans (also known as an "MRI"). CTs and MRIs can be performed with or without the use of dye contrast material (also known as "contrast" or "dye contrast").  Contrast is a dye that is

injected into the patient intravenously and spreads through the patient's system to assist in the identification of abnormalities in the patient's body. Contrast provides a clearer, more detailed image so that physicians can read diagnostic scan results more accurately.

43.    Some patients experience reactions to the contrast dye.  Minor reactions include transient nausea, vomiting, urticaria, pruritus, and diaphoresis.  Moderate reactions include faintness, prolonged vomiting and urticaria, facial and laryngeal edema, and mild bronchospasm.  Severe reactions include hypotensive shock, pulmonary edema, respiratory or cardiac arrest, and convulsions.

44.    Adverse reactions to the dye can be extremely dangerous, and Defendants were or should have been, at all material times, aware of these dangers.

45.    CMS therefore requires that all dye contrast procedures performed in the independent diagnostic testing facility setting be performed only under direct physician supervision.

## DEFENDANTS' FRAUDULENT CLAIMS

46.    During Relator's employment by Defendant, Relator is personally aware that approximately two to four patients per day at the Carrollwood facility received CTs and MRIs using dye contrast material which therefore required the direct supervision of a physician.

47.    On a daily basis at the Carrollwood facility, approximately ten to fifteen patients received CTs and MRIs; of these patients approximately one

half to one third (five to seven patients) were over the age of 65 and participants in the Medicare program; and of these patients, approximately one half (two to four patients) were receiving contrast.

48.    Relator worked for Defendants from one to three days per week from 8:00 a.m. to 2:30 p.m.

49.    Days that Relator worked for Defendants in 2022 included July 19, 21, 26, 28, August 2, 4, 9, 11, 16, 18, September 1, 6, 8, 12,15, 20, 22, 27, 29, October 4, 6, 7, 11, 12, 13, 18, 19, 20, 25, 26, 27, November 1, 3, 4, 8, 9, 10, 15, 16, 17, 21, 22, 23, December 6, 8, 9, 13, 14, 15, 20, 21, 22, 28, 29, and 30.

50.    During Relator's employment he was informed that it was Defendants' company policy to perform contrast procedures at any time a patient can be scheduled regardless of whether there is a physician or even a provider on-site.

51.    During Relator's employment Defendants' employees routinely performed contrast procedures after Relator left at 2:30 p.m. and on days when Relator was not there.  Thus, any procedures performed outside of the above detailed days and times at the Carrollwood location were performed by technicians without direct supervision, i.e., without a supervising physician present in the office suite or even available remotely as required by Medicare regulations; this includes dye contrast procedures performed on patients over the age of 65 for which Defendants received compensation from Medicare.

52.    During Relator's employment with Defendants, he was advised by one of the Advanced Registered Nurse Practitioners employed by Defendants

that she performed "remote monitoring" of CTs and MRIs that utilized dye contrast at Defendants' independent diagnostic testing facilities.

53.    Thus, Relator was personally advised by the individual performing the "remote monitoring" that Defendants did not have a physician performing medical supervision of dye contrast procedures, including patients for which Defendants received compensation from Medicare.

54.    Not having a physician performing the medical supervision of the dye contrast procedures placed patients at Defendants' independent diagnostic testing facilities at great risk of adverse reaction.

55.    On October 2, 2022, Greg Levy, Defendants' Vice President of Operations, East Zone, who upon information and belief, is not a licensed healthcare provider, stated in an email message to one of Defendants' office managers and others that "After 10/31, Brandi and her team will manage the contrast coverage."

56.    Brandi in Mr. Levy's message refers to Brandi Escapule, who is Defendants' Vice President Of Physician Relations.  Upon information and belief, Ms. Escapule is not a licensed healthcare provider.

57.    On December 28, 2022, Relator was advised by Ms. Escapule, that his services were no longer necessary because "SimonMed covers contrast remotely."

58.    Subsequently, there were no longer individuals performing the medical supervision of dye contrast procedures at Defendants' independent diagnostic testing facilities.  Rather, the procedures were performed by

technicians without direct supervision, i.e., without a supervising physician present in the office suite or even available remotely as required by Medicare regulations; this includes dye contrast procedures performed on patients over the age of 65.

59.    Based on Relator's personal observations, and review of internal documentation, Defendants submitted substantial claims for payment to and received reimbursement from Medicare for dye contrast procedures performed on Medicare patients without direct physician supervision as required by Medicare, including dye contrast procedures performed on patients over the age of 65 by radiology technicians that are supervised only by physician assistants or nurse practitioners remotely over video conferencing systems.

60.    Upon information and belief, and based on the similarity of practices, policies, procedures, and case mixes among the Defendants' various facilities, Defendants also submitted thousands of claims for payment to and received reimbursement from Medicare for dye contrast procedures performed on Medicare patients without the direct physician supervision required by Medicare and Defendants received payment from Medicare for these claims.

61.    The claims described above are false and fraudulent because Defendants represented that Medicare requirements, including the requirements of proper physician supervision, had been met when in fact they had not been met when they billed the claims to the MACs.

62.    Specifically, when Defendants filed the CMS 1500 claims, they expressly represented, as required by the CMS 1500 form under "Signature of

Physician or Supplier (Medicare, TRICARE, FECA, and Black Lung)" ... that in submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions which were available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) This claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and programs instructions for payment, including but not limited to . . . ; 5) The services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE ..." See CMS 1500, p. 2, Certifications.

63.     By expressly representing that all Medicare laws, regulations, and program instructions had been complied with and that the corresponding services were medically necessary and personally furnished by Defendants when in fact Defendants knew that they or more specifically, their physicians had not in fact provided the services under the appropriate level of supervision, Defendants misrepresented that they were entitled to payment.

64.     Based on Relators' personal observations, Defendants knew that these claims were false and fraudulent and knew or should have known of the

dangers (i.e., the risks to patient safety) of performing dye contrast scans without direct physician supervision.

65.    Defendants conspired to submit their false claims to Medicare for payment with full knowledge of the falsity of their claims. Moreover, they knew or should have known that submitting and receiving payment for these claims created an overpayment, yet they did not repay their fraudulently obtained funds to Medicare. This knowing failure to repay, in and of itself, violated the FCA.

66.    Had Medicare known the true nature of these claims, that is, that the dye contrast procedures performed by Defendants were not properly supervised, Medicare would not have reimbursed Defendants for these claims.

## CAUSES OF ACTION

## COUNT ONE VIOLATION OF 31 U.S.C. §3729(a)(1)(A)

67.    All foregoing Paragraphs are incorporated by reference as if fully set forth herein.

68.    In violation of 31 U.S.C. §3729(a)(1)(A), Defendants knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval, and specifically billed federal health care programs for dye contrast procedures performed without the required level of physician supervision.

69.    As a result of Defendants' violations of 31 U.S. §3729(a)(1)(A), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C.

§3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $13,508 to $27,018 for each violation.

## COUNT TWO VIOLATION OF 31 U.S.C. §3729(a)(1)(B)

70.    Foregoing paragraphs 1 through 66 are incorporated by reference as if fully set forth herein.

71.    In violation of 31 U.S.C. §3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

72.    As a result of Defendants' violations of 31 U.S. §3729(a)(1)(B), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. §3729(a)(1), to treble damages as determined at trial, plus a civil penalty of plus a civil penalty of $13,508 to $27,018 for each violation.

## COUNT THREE VIOLATION OF 31 U.S.C. §3729(a)(1)(G)

73.    Foregoing paragraphs 1 through 66 are incorporated by reference as if fully set forth herein.

74.    In violation of 31 U.S.C. §3729(a)(1)(G), Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Defendants knew their past, present, and future billings were improper, and they improperly and intentionally retained overpayments despite such knowledge.

75.    As a result of Defendants' violations of 31 U.S. §3729(a)(1)(G), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. §729(a)(1), to treble damages as determined at trial, plus a civil penalty of $13,508 to $27,018 for each violation.

### COUNT FOUR VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

76.    Foregoing paragraphs 1 through 50 are incorporated by reference as if fully set forth herein.

77.    In violation of 31 U.S.C. §3729(a)(1)(C), Defendants conspired to commit violations of 31 U.S.C. §§3729(a)(1)(A), (B), and (G).

78.    As a result of Defendants' violations of 31 U.S C. §3729(a)(1)(C), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. §729(a)(1), to treble damages as determined at trial, plus a civil penalty of plus a civil penalty of $13,508 to $27,018 for each violation.

### PRAYER FOR RELIEF

WHEREFORE, the Relator prays, on behalf of Plaintiff, for the following

A.    For Plaintiff's Causes of Action under 31 U.S.C. §3729, et seq., enter judgment against Defendants for the amount of Plaintiff's damages, trebled pursuant to 31 U.S.C. §3729(a), and the maximum allowable civil penalty for each violation of the FCA;

B.    Award Relator the maximum amount permitted pursuant to 31 U.S.C. § 3730(d);

C.    Award Relator all costs, including court cost, expert fees, investigative expenses, and reasonable attorneys' fees incurred by Relator in the prosecution of this suit;

D.    Grant Relator and the United States such other and further relief that the Court deems appropriate and proper.

Respectfully submitted,

/s/ Ryan D. Barack
**Ryan D. Barack**
Florida Bar No. 0148430
Primary:
rbarack@employeerights.com
Secondary:
jackie@employeerights.com
**Michelle Erin Nadeau**
Florida Bar No. 0060396
Primary:
mnadeau@employeerights.com
Secondary:
jackie@employeerights.com
**Kwall Barack Nadeau PLLC**
304 S. Belcher Rd., Suite C
(727) 441-4947
(727) 447-3158 Fax
Attorneys for Relator